UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

EPHRAIM STERN,                              :

               Petitioner,      :

   -against-                                :

UNITED STATES OF AMERICA,                   :

             Respondent.      :

--------------------------------------------------------x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:        _____
DATE FILED:    1/4/2013
```

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
PAUL A. CROTTY**

09 Civ. 6044 (PAC) (FM)

**FRANK MAAS,** United States Magistrate Judge.

       On December 15, 2003, petitioner Ephraim Stern ("Stern") pleaded guilty to a six-count criminal information ("Information") charging him with conspiracy to commit bank fraud and to transport stolen property (Count One), bank fraud (Count Two), conspiracy to commit transportation money laundering (Count Three), transportation money laundering (Count Four), conspiracy to commit transaction money laundering (Count Five), and transaction money laundering (Count Six).[1]  Thereafter, Judge Gerard E. Lynch sentenced Stern to concurrent determinate terms which, in the aggregate, amount to a sentence of 156 months in prison.  He presently is serving that sentence at the Federal Correctional Institution at Otisville, in Otisville, New York.

---

[1]    That same day, Stern also pleaded guilty to a one-count indictment charging him with making false statements to federal agents during the time that he was serving as a cooperating witness.  See United States v. Stern, 03 Cr. 81 (GEL) (ECF No. 1).  This latter charge is not relevant to Stern's petition for post-conviction relief and thus is not discussed further in this Report and Recommendation.

Stern seeks to vacate his conviction on all six counts of the Information, contending that he is actually innocent of the four money laundering-related charges in light of the Supreme Court's decisions in United States v. Santos, 553 U.S. 507 (2008), and Cuellar v. United States, 553 U.S. 550 (2008).  Although Counts One and Two charged Stern with conspiracy and bank fraud, rather than money laundering, he contends that the sentences imposed on these two counts also must be vacated "insofar as [they] . . . were derived from the alleged money laundering conduct."  (ECF No. 2 ("Pet'r's July 2009 Mem.") at 5).

In his petition ("Petition" or "Pet."), Stern alleges that (a) there was no factual basis for his plea, in violation of Rule 11(b)(3) of the Federal Rules of Criminal Procedure; (b) his plea was involuntary and unknowing because he did not understand that the conduct to which he allocuted did not constitute a crime; and (c) his continued imprisonment is unlawful under the Fifth Amendment Due Process Clause, as well as the Eighth Amendment.

Stern wishes to prosecute these claims through one of four alternative procedural vehicles.  First, he seeks an order vacating, correcting, or setting aside his sentence, pursuant to 28 U.S.C. § 2255 ("Section 2255"), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Although Stern acknowledges that this application is time-barred, he nevertheless urges the Court to permit him to proceed under an "actual innocence" exception to the statute of limitations. Alternatively, Stern contends that he is entitled to a writ of habeas corpus, pursuant to 28

2

U.S.C. § 2241 ("Section 2241"), or a writ of <u>audita</u> <u>querela</u> or error <u>coram</u> <u>nobis</u>, pursuant to the All Writs Act, 28 U.S.C. § 1651.[2]

Stern's case presents an unusual situation in which he has shown that he likely is actually innocent of at least some of the charges to which he pleaded guilty, but nonetheless is not entitled to habeas relief.  Stern's Petition therefore should be denied.

I.     <u>Background</u>

A.     <u>Offense Conduct</u>

The charges against Stern arose out of his participation in two different criminal ventures.  The first scheme, which led to the charges in Counts One through Four of the Information, involved transporting stolen checks to Israel, cashing the checks there, and then using the proceeds to repay the supplier of the checks in the United States. In the second scheme, described in Counts Five and Six of the Information, Stern served as an intermediary between Colombian narcotics traffickers and Israeli money launderers. The details of these alleged schemes, which in part were unearthed during a period that Stern was working as a cooperator, are as follows.

1.     <u>Stolen Check Cashing Scheme</u>

In or around 2000, Stern was introduced to Ricky Juliano ("Ricky"), who began supplying Stern with stolen checks that he and others needed to have cashed.  (<u>See</u>

---

[2]      Stern initially filed a "Petition for a Writ of Audita Querela and/or Error Coram Nobis."  (ECF No. 1).  He did not seek relief by way of a "motion" under Section 2255 until I directed the parties to submit additional briefing with respect to whether such relief remained available to him.  (<u>See</u> Section I.E, <u>infra</u>).

Ex. A at 1; Hearing Tr. 47).[3]  Initially, with the help of another co-conspirator, Jack

Alhalabi ("Alhalabi"), Stern had the checks cashed in the United States.  (Ex. A at 1-2;

Hearing Tr. 3-4, 47-48).  After the checks began "bouncing and coming back," however,

Stern asked Alhalabi if "he had a way to cash checks outside the United States."[4]  (Ex. A

at 1; Presentence Investigation Report ("PSR") ¶ 26).  Alhalabi told Stern that he believed

that he could cash the checks in Israel.  (PSR ¶ 27).  Accordingly, Stern arranged for

Alhalabi to fly to Israel in November 2000, and provided him with some spending money.

(Id.).

A few days after Alhalabi arrived in Israel, couriers delivered

approximately 250 to 300 checks, worth more than $800,000, to his hotel.[5]  Alhalabi then

passed these checks to a relative, who informed him that it would take approximately four

weeks for the checks to be cashed.  Alhalabi subsequently returned to New York in early

December 2000.  (Id. ¶¶ 28-29).

Later that month, Stern directed Alhalabi to return to Israel to "pick up the

proceeds" of the stolen checks.  United States v. Stern, 02 Cr. 1015 (ECF No. 15, Ex. B

---

[3]        "Ex." refers to the exhibits annexed to a letter from Assistant United States
Attorney Kan M. Nawaday to the Court, dated Oct. 15, 2010 ("Oct. 15, 2010 Letter").  "Hearing
Tr." refers to the transcript of an evidentiary hearing held before me on February 23, 2011.
(ECF No. 30).  "Plea Tr." refers to the transcript of Stern's guilty plea on December 15, 2003.
"Sentencing Tr." refers to the transcript of Stern's initial sentencing on October 29, 2004.

[4]        Stern contends that he "never" asked Alhalabi whether he had any way to cash
checks outside the United States.  (PSR at 25).

[5]        Stern contends that Alhalabi transported the checks and that they had a face value
of only $250,000 to $300,000.  (Id.).

(Aff. of Martina A. Zimmerman, sworn to on May 7, 2001 ("Zimmerman Aff.")), at 13).

Alhalabi flew back to Israel in late December 2000.  (PSR ¶ 30).  Stern told Alhalabi that

"he needed the money because people were pressuring him."  (Id.; Zimmerman Aff. at

14).  As Stern since has explained, he wanted the money so that he could pay Ricky.  (See

Hearing Tr. 6, 10-11; see also id. at 32 ("The reason [wa]s to bring back the money.  You

got checks you got to get paid for, that's all.")).

   The parties disagree as to how Ricky received payment.  According to

Stern, a co-conspirator named Avraham Zaltzman ("Zaltzman") transported the cash

proceeds of the checks on a plane from Israel to New York after receiving them from

either Alhalabi or a rabbi named Horowitz ("Rabbi Horowitz").  That money eventually

was given to Ricky.  (Id. at 5-11, 18, 24, 27, 36-37).  In Stern's view, once Ricky was

paid, the "check cashing scheme would be complete."  (Id. at 10-11).  The Government,

on the other hand, contends that Zaltzman never physically transported any cash to the

United States.  (See id. at 49-50; ECF No. 42 ("Gov't's July 2011 Mem.") at 15).  The

Government further contends that the money was not sent to the United States by way of

a wire transfer.  (See Hearing Tr. 32; Gov't's July 2011 Mem. at 16 ("the record

establishes that Stern did not transfer the stolen check proceeds by bank wire"); letter

from AUSA Nawaday to the Court, dated Jan. 7, 2011 ("Jan. 7, 2011 Letter") at 3

("Notably, [Stern] did not transfer the stolen check proceeds by bank wire")).  Rather, in

the Government's view, Ricky received the proceeds of these stolen checks through a

"black market system of cash payment where cash is released in one place when paid in another . . . as in a hawala."[6]  (Jan. 7, 2011 Letter at 3).

The Government alleges that there were three such "hawala" transfers. (Hearing Tr. 49).  In one instance, Alhalabi delivered between $30,000 and $40,000 in cash to Zaltzman in Israel; Zaltzman then contacted another co-conspirator in Israel, who directed an individual in New York named Aaron Bornstein ("Bornstein") to "release" an equivalent amount of money to Stern.  (Id. at 49-50, 60).  On two other occasions, after Alhalabi made cash deliveries of between $5,000 and $10,000 to Rabbi Horowitz, Stern called the Rabbi's son in London, who arranged for Stern to pick up the equivalent amount of money in the United States.[7]  (See id. at 49-50; PSR ¶ 30; Ex. A at 3).

In January 2001, Alhalabi's nephew brought a second batch of stolen checks to Israel.  (See id. at 26; PSR ¶ 32; Zimmerman Aff. at 15).  Between the two trips, approximately $1.3 million in stolen checks was transported from the United States to Israel.  (PSR ¶ 32).

---

[6]    A "hawala" money transfer system "operates in a similar fashion to a Western Union business."  See United States v. Elfgeeh, 515 F.3d 100, 108 (2d Cir. 2008).  "In a hawala system . . . funds are transferred by customers to a hawala operator, or 'hawaladar,' in one country . . . and then corresponding funds, less any fees, are disbursed to recipients in another country . . . by foreign hawaladars associated with the [first] hawaladar."  United States v. Banki, 733 F. Supp. 2d 404, 407 (S.D.N.Y. 2011).

[7]    At the evidentiary hearing, however, Special Agent Danny Cahill ("Agent Cahill") of the Federal Bureau of Investigation, who debriefed Stern during the period that he was cooperating, conceded that he did not know "how th[e] money got to New York."  (Id. at 61-62).  It appears that the agent was referring to the transaction involving Bornstein during this testimony.  (See id.).

Alhalabi returned to New York on January 18, 2001.  (Id. ¶ 33).  After Stern picked him up at the airport, Stern informed him "that the 'Italians' wanted their money from the checks [that Alhalabi] had helped negotiate."  (Zimmerman Aff. at 15).  Alhalabi explained that he was unable to cash a substantial number of the stolen checks.  (Id. at 16; PSR ¶ 33).  To "enable Stern to explain to the 'Italians' why he had not paid them," Alhalabi had the uncashed stolen checks sent from Israel to a business in the Bronx operated by two of Alhalabi's relatives.  (See Zimmerman Aff. at 16).  The uncashed stolen checks were delivered there on February 5, 2001.  (Id.).

Alhalabi returned to Israel a third time in late February 2001 to cash more checks, but was arrested by the Israel National Police shortly after his arrival, and became a cooperating witness.[8]  (Id.; PSR ¶ 34).

2.    Narcotics Money Laundering Scheme

In or around 2000 or 2001, Zaltzman recruited Stern to serve as an intermediary between a "group in Israel that [wa]s laundering drug money," and Colombian drug traffickers "who ha[d] money that need[ed] to be laundered."  (ECF No. 14 (Supp. Decl. of Ephraim Stern, dated Jan. 17, 2010 )("Supp. Decl."), ¶ 11; Ex. A at 4).  Stern was "a natural to play that role" because he spoke both Hebrew and Spanish fluently.  (Supp. Decl. ¶ 11).

---

[8]    In 2004, Alhalabi pleaded guilty in this District to various related criminal charges.  See United States v. Alhalabi, 02 Cr. 373 (SHS).  Alhalabi was sentenced to a three-year term of probation and was ordered to pay a $5,000 fine.  Id. (ECF No. 11).

Stern's role in this scheme was not limited to facilitating communications among the co-conspirators. Thus, on five or six occasions between 2001 and 2002, Stern personally picked up cash proceeds of narcotics trafficking and delivered them to other conspirators in New York, including Bornstein. (See Ex. A at 5). The total amount of money that Stern personally picked up and delivered was more than $1.7 million. (PSR ¶ 38).

The Government alleges that Stern used some of the narcotics proceeds to purchase merchandise such as batteries, cosmetics, and paper, which he then shipped to a representative of the narcotics traffickers named Federico ("Federico") in Panama. In this manner, the Government says, Stern gave Federico "the cover of a legitimate businessman." (Ex. A at 6). Although Stern acknowledges that he purchased this merchandise and shipped it to Panama, he denies that he used any money from any of the pick-ups to do so. (ECF No. 23 ("Stern Decl.") ¶¶ 7-8; Hearing Tr. 12). Rather, Stern contends that he was in the business of buying "closeout lots" and reselling them for a substantial profit in the "duty free zone" in Panama. (Stern Decl. ¶¶ 9-10). Therefore, in his view, purchasing the merchandise and shipping it to Panama was simply part of "a legitimate business venture having nothing to do with narcotics or money laundering." (Id. ¶ 10).[9]

---

[9]     In March 2002, Stern and Federico evidently twice "discussed [Stern] picking up money in New York, purchasing paint with the money, and sending [the] paint to Federico." (Ex. B at 2). It does not appear, however, that Stern ever made such a purchase.

The Government also alleges that Stern received wire transfer instructions from a co-conspirator and passed those instructions along to another co-conspirator, with the understanding that the latter would wire transfer drug money to Colombia. (PSR ¶ 40). After this proceeding was commenced, Stern denied that such wire transfers ever occurred.[10] (Supp. Decl. ¶¶ 6, 9).

B.     Guilty Plea

On December 15, 2003, Stern appeared before Judge Gerard E. Lynch to enter a plea of guilty to all six counts of the Information. (See Plea Tr. 1). During Stern's allocution, Judge Lynch asked him to explain, in his own words, what he did that made him guilty of the crimes with which he had been charged. (Id. at 21). Stern gave the following answer:

> Well, as I helped out the Columbians [sic] in getting these checks transported out from here to Israel, as well as I helped receiving the money and delivering the money and giving it over, as well as having to wire transfer it out, the money, and I also helped by phone conversations.

(Id. at 21-22).

Judge Lynch and Stern then engaged in the following colloquy regarding the stolen check cashing conspiracy:

|  |  |
|---|---|
| THE COURT: | And the checks that you're referring to, what checks are these or what were they about? |
| [STERN:] | These were stolen checks. |

---

[10]     Stern's objections to the PSR contain no such denials. (See PSR at 25-26).

| | |
|---|---|
| THE COURT: | And you knew that they were stolen checks? |
| [STERN:] | Yes. |
| THE COURT: | And your role was to, I think you just said, to help get the checks from here to Israel? |
| [STERN:] | Basically, I gave it over here to somebody who made the arrangements from here to get it to Israel. |
| THE COURT: | O.K.  And they were going to be cashed there? |
| [STERN:] | Cashed over there and brought back the cash over here. |

(Id. at 22).

Judge Lynch then addressed the narcotics money laundering scheme:

| | |
|---|---|
| THE COURT: | And you mentioned Colombians, were they the people involved with the checks or was that a separate – |
| [STERN:] | That was separate, just picking up cash, giving it here to somebody, and this person would make arrangements. It supplied that to them to other countries to their bank accounts. |
| THE COURT: | And that money that you were involved with with the Colombians, did you know where that money came from? |

10

[STERN:]                          It was drug money.

(Id. at 22-23).

When Judge Lynch then asked the Government whether there were other questions that should be asked, the Assistant United States Attorney ("AUSA") responded, "perhaps the purpose of the wire transfers to satisfy the elements of disguising the nature." (Id. at 24). The AUSA made clear that he was referring to wire transfers that allegedly had occurred in connection with both the stolen check cashing scheme and the narcotics money laundering scheme. (See id. ("Both the drug money and the bank fraud. Counts 4 and 6 of the [Information], in each case.")). When Judge Lynch then asked Stern why he had engaged in these alleged wire transfers, he answered: "The wire transferring of the money was basically because they picked up cash and that's the only way they got it out of the country." (Id. at 25). Judge Lynch pressed Stern further, asking: "But you understood that part of the reason why this was being done in both cases was to hide where the money was coming from?" (Id.) (emphasis added). Stern responded: "Yeah, to hide — correct, yes, Your Honor." (Id.).

Judge Lynch then accepted Stern's guilty plea, noting that, in addition to Stern's admissions at the plea proceeding, the "various statements that . . . Stern made to the authorities and maybe even more importantly t[he] various telephone calls and other activities that he engaged in during the period of his cooperation . . . provide[d] a factual basis for the offense and ma[d]e it extremely difficult at a minimum to attempt to defend the case in any way." (Id. at 25-26).

C.      Sentencing and Appeals

On November 3, 2004, Judge Lynch sentenced Stern to an aggregate term of 156 months' imprisonment pursuant to the United States Sentencing Guidelines ("Guidelines").  (Sentencing Tr. 42-43).  Specifically, Judge Lynch imposed concurrent sentences of 60 months on the conspiracy to commit bank fraud charge and 156 months on the bank fraud and four money laundering-related charges.[11]  (Id.).

Following Stern's appeal, the Second Circuit remanded the case in May 2005 to allow Judge Lynch to consider whether to resentence Stern in light of the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), which rendered the Guidelines advisory.  Stern, 02 Cr. 1015 (ECF No. 41).  By order dated June 9, 2005, Judge Lynch declined to modify Stern's sentence, stating emphatically that he believed that a prison sentence of 156 months was appropriate considering the factors identified in the Sentencing Reform Act, 18 U.S.C. § 3553(a).  Id. (ECF No. 42).

Stern filed a second appeal in December 2005.  Id. (ECF No. 47).  In connection with that appeal, Stern's counsel submitted a brief pursuant to Anders v. California, 386 U.S. 738 (1967), stating that there were no non-frivolous grounds for appeal.  (ECF No. 9 ("Gov't's Dec. 2009 Mem.") at 2).  The Second Circuit affirmed the conviction and sentence by summary order on February 9, 2007.  Stern, 02 Cr. 1015 (ECF No. 48).  Thereafter, Stern did not seek a writ of certiorari.

---

[11]      Judge Lynch also imposed a concurrent sixty-month sentence on the false statements charge in the Indictment.  (Id.).

12

D.     *Santos* and *Cuellar*

On June 2, 2008, more than one year after Stern's time to file a petition for a writ of certiorari had expired, the Supreme Court decided <u>Santos</u> and <u>Cuellar</u>.  At issue in <u>Santos</u> was whether the term "proceeds" as used in the federal money laundering statute, 18 U.S.C. § 1956 ("Section 1956"), means "receipts" or "profits."  553 U.S. at 509.  A majority of the Court concluded in the context of that case, which involved the operation of an illegal gambling business, that "proceeds" meant "profits."  <u>Id.</u> at 509-10, 514; <u>see also id.</u> at 528 (Stevens, J., concurring in the judgment).  Only a four-Justice plurality, however, held that "proceeds" means "profits" regardless of the nature of the underlying criminal activity.  <u>Id.</u> at 514.  Justice Stevens, who concurred only in the judgment vacating the defendants' convictions, opined that the Court "need not pick a single definition of 'proceeds' applicable to every unlawful activity."  <u>Id.</u> at 525 (Stevens, J., concurring in the judgment).

<u>Cuellar</u> involved a challenge to Section 1956(a)(2)(B)(i), a provision of the money laundering statute that prohibits transporting, transmitting, or transferring into or out of the United States money representing the proceeds of certain unlawful activities.[12]

---

[12]     That statute provides, in pertinent part:

Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds . . . to a place in the United States from or through a place outside the United States —

(B)     knowing that the monetary instrument or

(continued...)

Cuellar, 553 U.S. at 553.  The Supreme Court held that to obtain a conviction under that

"transportation" provision, the Government must prove that "the purpose — not merely

effect — of the transportation was to conceal or disguise" the nature, location, source,

ownership, or control of the money being transported.  Id. at 567.  Overruling a number of

circuits, including the Second Circuit, see United States v. Ness ("Ness I"), 466 F.3d 79,

81 (2d Cir. 2006), the Court further determined that evidence that a defendant had made

substantial efforts to conceal money during transportation, standing alone, was

insufficient to establish the concealment element of the crime.  Cuellar, 553 U.S. at 563

("merely hiding funds during transportation is not sufficient to violate the statute, even if

substantial efforts have been expended to conceal the money").  The Court reasoned that

evidence of concealment during transport related to "how" the money was transported,

---

[12](...continued)

> funds involved in the transportation,
> transmission, or transfer represent the
> proceeds of some form of unlawful activity
> and knowing that such transportation,
> transmission, or transfer is designed in
> whole or in part —
>
> (i)     to conceal or disguise the
>         nature, the location, the
>         source, the ownership, or the
>         control of the proceeds of
>         specified unlawful activity
>
> shall be sentenced to a fine of not more than $500,000 or twice the
> value of the monetary instrument or funds involved in the
> transportation, transmission, or transfer, whichever is greater, or
> imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(2)(B)(i).

14

but not "why."  Id. at 566 ("[H]ow one moves the money is distinct from why one moves

the money.  Evidence of the former, standing alone, is not sufficient to prove the latter.")

(emphasis in original).  The Second Circuit subsequently applied Cuellar's reasoning to

Section 1956(a)(1)(B)(i) of the money laundering statute, which makes it a crime to

conduct a "financial transaction" using the proceeds of specific unlawful activities,

knowing that the purpose of the transaction is to disguise or conceal certain attributes of

the money.[13]  See United States v. Ness ("Ness II"), 565 F.3d 73, 75, 78 (2d Cir. 2008)

(reversing both transaction and transportation money laundering convictions because the

---

[13]      The statute  provides, in relevant part:

> Whoever, knowing that the property involved in a financial
> transaction represents the proceeds of some form of unlawful
> activity, conducts or attempts to conduct such a financial
> transaction which in fact involves the proceeds of specified
> unlawful activity —
>
> > (B)      knowing that the transaction is designed in
> > whole or in part —
> >
> > > (i)      to conceal or disguise the
> > > nature, the location, the
> > > source, the ownership, or the
> > > control of the proceeds of
> > > specified unlawful activity
>
> shall be sentenced to a fine of not more than $500,000 or twice the
> value of the monetary instrument or funds involved in the
> transportation, transmission, or transfer, whichever is greater, or
> imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(1)(B)(i).

evidence showed "only an intent to conceal the transportation, not an intent to transport in order to conceal").

  E.  <u>Petition and Evidentiary Hearing</u>

   After Stern initially filed a "Petition for a Writ of Audita Querela and/or Error Coram Nobis" on July 2, 2009, (ECF No. 1), Your Honor referred the matter to me on November 10, 2009, for a Report and Recommendation.  (ECF No. 8).  On December 7, 2009, the Government filed its opposition papers, (ECF No. 9), and Stern filed his reply on February 1, 2010, (ECF No. 15).  In their papers, neither Stern nor the Government addressed whether Stern could obtain relief under Sections 2255 and 2241.

   On June 9, 2010, I directed that the parties submit additional briefing addressing whether either of those remedies was available to Stern, explaining that "[b]ecause the Second Circuit has suggested . . . that the writs of <u>coram nobis</u> and <u>audita querela</u> may be sought only when neither Section 2255 nor Section 2241 is an available remedy, the Court will first have to consider whether relief under those statutes is available."  (ECF No. 16 (citing <u>United States v. Richter</u>, 510 F.3d 103, 104 (2d Cir. 2007); <u>Triestman v. United States</u>, 124 F.3d 361, 380 n.24 (2d Cir. 1997))).  Stern filed his supplemental brief on July 3, 2010 (ECF No. 18); the Government responded on July 23, 2010 (ECF No. 19).

   After reviewing the parties' submissions and conferring with counsel, I concluded that an evidentiary hearing was warranted with respect to the issues of Stern's alleged actual innocence and the diligence (or lack thereof) with which he pursued his

actual innocence claim.[14]  (See ECF No. 20).  At that hearing, held on February 23, 2011,

Stern testified on his own behalf, (see id. at 1-45), while the Government called Agent

Cahill as its sole witness, (id. at 46-73).  Following the hearing, both parties submitted

additional briefs.  (See ECF Nos. 36, 42-43).  The Petition therefore is fully submitted.

## II.   Discussion

Section 2255 generally is the proper vehicle for federal prisoners to utilize

to contest the legality of their convictions and sentences.  See Jiminian v. Nash, 245 F.3d

144, 146-47 (2d Cir. 2001).  In certain circumstances, however, when relief under Section

2255 is procedurally unavailable and "the failure to allow for collateral review would

raise serious constitutional questions," a prisoner may turn to Section 2241 to bring a

claim otherwise within the scope of Section 2255.  Triestman, 124 F.3d at 377.  Similarly,

the writs of audita querela and error coram nobis lie only in the absence of other avenues

for collateral relief.  See Richter, 510 F.3d at 104; Porcelli v. United States, 404 F.3d 157,

158 (2d Cir. 2005).  Accordingly, the first question presented by the Petition is whether

Stern may proceed under Section 2255 and, if not, whether relief is available under

Section 2241 and the extraordinary writs.

---

[14]      The evidentiary hearing was held two months prior to the Supreme Court's
decision in Cullen v. Pinholster, ___ U.S. ___, 131 S. Ct. 1388 (2011), which limited the
authority of district courts to hold evidentiary hearings with respect to habeas petitions filed
under Section 2254.  It is unlikely that Pinholster applies here because this proceeding
challenges a federal, rather than a state, conviction.  Moreover, unlike this case, Pinholster
involved an ineffective assistance of counsel claim.  See United States ex. rel. Brady v. Hardy,
No. 10-C-2098, 2011 WL 1575662 (N.D. Ill. Apr. 25, 2011) (finding Pinholster inapplicable to
the court's decision to hold an evidentiary hearing on petitioner's actual innocence claim).

A.      Section 2255

      1.      Timeliness

      A motion pursuant to Section 2255 must be filed within one year of the

latest of four triggering dates:

      (1)     the date on which the judgment of conviction becomes
               final;

      (2)     the date on which the impediment to making a motion
               created by governmental action in violation of the
               Constitution or laws of the United States is removed, if
               the movant was prevented from making a motion by
               such governmental action;

      (3)     the date on which the right asserted was initially
               recognized by the Supreme Court, if that right has been
               newly recognized by the Supreme Court and made
               retroactively applicable to cases on collateral review;
               or

      (4)     the date on which the facts supporting the claim or
               claims presented could have been discovered through
               the exercise of due diligence.

28 U.S.C. § 2255(f)(1)-(4).

      Here, the only potentially applicable triggering dates are found in

subsections (1) and (3).  Stern concedes that his Petition is untimely under subsection (1).

(See Pet'r's July 2009 Mem. at 6 ("because 28 U.S.C. § 2255 imposes a one year period

of limitations on any motion brought under that section (measured from the date that the

Judgment of Conviction became 'final'), Petitioner cannot seek collateral relief by Writ

of Habeas Corpus")).  Indeed, the statute of limitations expired on May 11, 2008, more than one year before Stern filed his Petition.[15]

The Government suggests that Stern might be able to "get around" the statute of limitations under subsection (3).  (See Gov't's Dec. 2009 Mem. at 13).  Even if the Court were to assume that Santos and Cuellar recognized new rights and that those rights apply retroactively to cases on collateral review, Stern would not have commenced this proceeding in time.  Indeed, Stern filed his Petition on July 2, 2009, (see ECF No. 1), exactly thirteen months after those decisions were issued.  See Santos, 553 U.S. at 507; Cuellar, 553 U.S. at 550.  His petition therefore would still be untimely.

Stern nevertheless argues that the statute of limitations should not preclude the Court from reviewing the merits of his substantive claims both under the doctrine of equitable tolling and because he is actually innocent of the money laundering-related charges to which he pleaded guilty.  (See ECF No. 18 ("Pet'r's July 2010 Mem.") at 1-9).

a.    Equitable Tolling

AEDPA's statute of limitations is not jurisdictional and, consequently, does not always serve as an absolute bar to all claims brought after the limitations period has

---

[15]    The Second Circuit entered its judgment affirming Stern's conviction on February 9, 2007.  See Stern, 02 Cr. 1015 (ECF No. 48).  His conviction therefore became final ninety days later, on May 11, 2007, the date by which his petition for a writ of certiorari had to be filed.  See Clay v. United States, 537 U.S. 522, 524-25 (2003) ("For the purpose of starting the clock on [Section] 2255's one-year limitation period, we hold, a judgment of conviction becomes final when the time expires for filing a petition for certiorari."); Sup. Ct. R. 13(1) ("Unless otherwise provided by law, a petition for a writ of certiorari to review a judgment in any case . . . entered by . . . a United States court of appeals . . . is timely when it is filed with the Clerk of this Court within 90 days after entry of the judgment.").

run.  Holland v. Florida, ___ U.S. ___, 130 S. Ct. 2549, 2560 (2010).  Rather, the statute

of limitations is subject to equitable tolling if a petitioner can show "(1) that he has been

pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his

way and prevented timely filing."  Id. at 2562 (internal quotations omitted). "The

diligence required for equitable tolling purposes is reasonable diligence, not maximum

feasible diligence."  Id. at 2565 (internal citations and quotation marks omitted).  The

inquiry turns on whether "the petitioner act[ed] as diligently as reasonably could have

been expected under the circumstances[.]"  Baldayaque v. United States, 338 F.3d 145,

153 (2d Cir. 2003).

        Stern's attempt to invoke equitable tolling fails at the first step of the

analysis because he cannot show that he pursued his actual innocence claim with

reasonable diligence.  Indeed, Stern could have advanced his claim long before Santos

and Cuellar were decided since the arguments that the Supreme Court adopted in those

cases were available to Stern throughout the limitations period.  See United States v.

Cuellar, 441 F.3d 329 (5th Cir. 2006) (holding that concealment itself must be the

"design" of the defendant's activities), rev'd on rehearing en banc, 478 F.3d 282 (5th Cir.

2007), rev'd, 553 U.S. 550 (2008); United States v. Scialabba, 282 F.3d 475, 478 (7th Cir.

2002) (Section 1956's prohibition of transactions involving criminal "proceeds" applies

to transactions involving criminal profits, not criminal receipts).  Although it is true that

Stern's Cuellar argument likely would have failed under the law of the Second Circuit at

that time, see Ness I, 466 F.3d at 81, the fact that an argument would have been futile

does not excuse a petitioner's failure to raise it.  See Engle  v. Isaac, 456 U.S. 107, 130

n.35 (1982) ("futility cannot constitute cause [to excuse a procedural default] if it means

simply that a claim was unacceptable to that particular court at that particular time")

(internal quotation marks omitted).[16]

        Moreover, Stern failed to pursue his actual innocence claim diligently even

after the Supreme Court handed down Santos and Cuellar.  In fact, he first filed his

Petition on July 2, 2009 – more than one year after those cases were decided.  (See ECF

No. 1).  Stern maintains that it was reasonable for him to continue to believe that he was,

as a matter of law, guilty until May 8, 2009, when the Second Circuit decided Ness II and

extended Cuellar's reasoning to the transaction money laundering provision.  (See Pet'r's

July 2010 Mem. at 3-4).  The Second Circuit's subsequent extension of Cuellar to

transaction money laundering, however,  has no bearing on Stern's separate contention

that he is innocent under Santos with respect to the transportation money laundering

charge.  Moreover, the Supreme Court remanded Ness I in light of Cuellar, thus

intimating that Cuellar might have a bearing on the Second Circuit's analysis with respect

to transaction money laundering.  As the Second Circuit has observed, "[a]lthough the

transaction and transportation provisions of the money laundering statute are distinct, they

---

    [16]    It is less clear whether Second Circuit case law would have foreclosed a Santos claim, although it appears that this probably is true.  See United States v. Miller, Nos. 02 Civ. 1234, 97 Cr. 199, 2003 WL 24057592, at *3 (N.D.N.Y. Aug. 18, 2003) ("In the somewhat similar context of the RICO laws, the Second Circuit rejected a claim that 'proceeds' should be based on net profits . . . There is no basis for concluding that Congress intended a less expansive definition in the money laundering statute (which is a racketeering activity) than it did in the RICO forfeiture statute.").

are almost identically worded.  The use of similar language, let alone identical language, in two different provisions of the same statute is, as the Supreme Court has emphasized, a strong indication that the two provisions should be interpreted pari passu, i.e., in the same manner."  United States v. Huezo, 546 F.3d 174, 179 (2d Cir. 2008).

Given these circumstances, Stern cannot show that he is entitled to equitable tolling of the statute of limitations on his habeas claims.

### b.    Actual Innocence Gateway

It is well established that a credible showing of actual innocence opens a "gateway through which a habeas petitioner m[ay] pass to have his otherwise barred constitutional claim considered on the merits."[17] Herrera v. Collins, 506 U.S. 390, 404 (1993).   That gateway claim, in which a petitioner simply seeks to raise "sufficient doubt about his guilt" to justify a review of the merits of his underlying claims,  Schlup v. Delo, 513 U.S. 298, 314, 316 (1995), differs from a "substantive" actual innocence claim, in which the petitioner seeks to have his conviction vacated on grounds that new evidence establishes that he did not commit the acts charged, see Herrera, 506 U.S. at 417.  In this proceeding, Stern appears to have raised both types of actual innocence claims. Consequently, before turning to the merits of Stern's freestanding, substantive claims, the Court must consider whether the strength of his procedural claims entitles him to review of the substantive claims set forth in his Petition.

---

[17]    That procedural actual innocence gateway exception applies even when a petitioner's conviction is, as here, the result of a guilty plea.  See Bousley v. United States, 523 U.S. 614, 623-24 (1998); Friedman v. Rehal, 618 F.3d 142, 152 (2d Cir. 2010).

Until recently, whether a petitioner who fails to act with reasonable diligence in filing his petition could overcome AEDPA's statute of limitations based on a showing of actual innocence had been an open question in this circuit.  See Whitley v. Senkowski, 317 F.3d 223, 225 (2d Cir. 2003).  Now, however, the Second Circuit has held that a claim of actual innocence falls under an "equitable exception" to the limitations period, permitting review of a habeas petition "notwithstanding an otherwise unexcused delay in filing."  Rivas v. Fischer, 687 F.3d 514, 539-540 (2d Cir. 2012).  As the Rivas court noted, serious constitutional concerns would arise if AEDPA's statute of limitations were "read to deny collateral review to a prisoner who is actually innocent." Id. at 552; see also Triestman v. United States, 124 F.3d 361, 378-79 (2d Cir. 1997) ("serious Eighth Amendment and due process questions would arise" were the AEDPA read to deny collateral review to an actually innocent petitioner); In re Dorsainvil, 119 F.3d 245, 248 (3d Cir. 1997) ("Were no other avenue of judicial review available for a party who claims that s/he is factually or legally innocent as a result of a previously unavailable statutory interpretation, we would be faced with a thorny constitutional issue").[18]

---

[18]    A number of other circuits, however, have held – or at least suggested – that an actual innocence claim does not constitute an exception to the AEDPA's limitations period.  See Escamilla v. Jungwirth, 426 F.3d 868, 871-72 (7th Cir. 2005); David v. Hall, 318 F.3d 343, 347 (1st Cir. 2003); Cousin v. Lensing, 310 F.3d 843, 849 (5th Cir.2002).  On October 29, 2012, the Supreme Court granted certiorari in Perkins v. McQuiggin, 670 F.3d 665 (6th Cir. 2012), which presumably will settle the issue.  McQuiggin v. Perkins, No. 12-126, 133 S.Ct. 527 (Oct. 29, 2012).  In the interim, "[c]ourts in this Circuit are bound to apply [Rivas] 'unless and until its rationale is overruled, implicitly or expressly, by the Supreme Court or [the Second Circuit].'"

(continued...)

Schlup requires that a procedural actual innocence claim be supported by a "substantial showing," but this is "by no means equivalent to the standard of Jackson v. Virginia, 443 U.S. 307 (1979), that governs review of claims of insufficient evidence." Schlup, 513 U.S. at 330. Under the familiar Jackson standard, a conviction must be upheld unless "[n]o rational trier of fact could have found proof of guilt beyond a reasonable doubt." 443 U.S. at 324. By contrast, under Schlup, "the mere existence of sufficient evidence to convict" does not foreclose review of a petitioner's claims. Schlup. 513 U.S. at 330; see also Rivas, 687 F.3d at 542-43 ("Although the Schlup standard is demanding and permits review only in the extraordinary case, the Court has emphasized that the standard does not require absolute certainty about the petitioner's guilt or innocence") (internal quotations omitted). Instead, the inquiry turns on a "probabilistic determination about what reasonable, properly instructed jurors would do" based on "all the evidence," regardless of whether that evidence would be admissible at a trial. Schlup, 513 U.S. at 328-29.

Schlup nevertheless requires that the petitioner's claim of actual innocence be both "credible" and "compelling." Rivas, 687 F.3d at 581 (citing House v. Bell, 547 U.S. 518, 521 (2006)). "To be credible, such a claim requires [the] petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical

---

[18](...continued)
United States v. Polouiizzi, 564 F.3d 142, 160 (2d Cir. 2009).

evidence – that was not presented at trial." <u>Schlup</u>, 513 U.S. at 324.  For a claim to be "compelling," the petitioner must show that "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt – or to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." <u>House</u>, 547 U.S. at 538.

        In this case, Stern claims that he is actually innocent because of a change in the law resulting from the Supreme Court's decisions in <u>Santos</u> and <u>Cuellar</u>.  Courts disagree, however, as to whether an actual innocence claim under <u>Schlup</u> may be based on an intervening change in the law, rather than simply "new reliable evidence." <u>Compare</u> <u>Sanchez v. Lee</u>, No. 10 Civ. 7719 (PKC) (AJP), 2011 WL 3477314, at *3 (S.D.N.Y. Aug. 8, 2011) (change in the law insufficient to satisfy actual innocence standard), <u>with</u> <u>Johnson v. Bellnier</u>, No. 09 Civ. 381 (KAM) (RER), 2011 WL 3235708, at *10-15 (E.D.N.Y. July 27, 2011) (actual innocence claim may be premised on an intervening change in the law), <u>and</u> <u>Petronio v. Walsh</u>, 736 F. Supp. 2d 640, 658 (E.D.N.Y. 2010) ("petitioners may show actual innocence not only through the introduction of new evidence but by highlighting intervening changes in the law"); <u>see also</u> <u>Fernandez v. Smith</u>, 558 F. Supp. 2d 480, 493-94 (S.D.N.Y. 2008) (concluding that "failure to consider [petitioner's] claim would result in manifest injustice" when "his actions . . . simply did not constitute [the charged crime] as a matter of law, and it would be manifestly unjust for him to serve a sentence for a crime that he did not commit").  If a gateway actual innocence claim requires a showing of new evidence, Stern obviously

cannot escape his untimely filing.  On the other hand, if the claim may be based on an

intervening change in the law, a different result may obtain.  Rather than attempting to

resolve this issue, I will assume for present purposes that Stern may demonstrate his

actual innocence based upon an intervening change in the law.[19]  On that assumption, the

question becomes:  is Stern actually innocent under the Schlup standard in light of the

Supreme Court's decisions in Santos and Cuellar.

        i.       Stern's Actual Innocence Claim With Respect to
                Counts Three and Four

        Count Three of the Information charged Stern with conspiracy to commit

transportation money laundering, in violation of Section 1956(h).  Count Four charged

him with the substantive crime of transportation money laundering, in violation of

Section 1956(a)(2)(B)(i).  Stern, 02 Cr. 1015 (ECF No. 10 ("Information") ¶¶ 8-13).

Further, in Count Four, the United States Attorney alleged that Stern "arranged the

transfer from Israel to the United States of the proceeds of bank fraud and the interstate

transportation of stolen property, by arranging the transfer of the proceeds to a co-

---

[19]      One might also argue, however, that an actual innocence claim cannot be based
on an intervening change in the law since Section 2255(f)(3) already provides a built-in
exception for innocence claims based on changes in the law.  See Prost v. Anderson, 636 F.3d
578, 585 (10th Cir. 2011) (noting that Congress included Section 2255(f)(3) in the AEDPA
specifically to ensure that petitioners who brought innocence claims based on new statutory
interpretations would be permitted to "assert such claims in initial § 2255 motions without the
risk of being time barred").  Allowing petitioners to bring actual innocence claims based on new
statutory interpretations outside the ordinary limitations period would have the undesirable effect
of reading AEDPA in such a way as to render Section 2255(f)(3) meaningless.

conspirator in Israel who in turn arranged for a co-conspirator in London to transfer a corresponding amount to Stern in New York."  (Id. ¶ 13) (emphasis added).

To establish his actual innocence gateway claim with respect to the conspiracy charge, Stern must prove that it is more likely than not that no reasonable juror would find beyond a reasonable doubt either that (a) two or more people agreed to commit transportation money laundering, or (b) Stern knowingly joined the conspiracy with the specific intent to commit the crime of transportation money laundering.  See United States v. Garcia, 587 F.3d 509, 515 (2d Cir. 2009).  To establish his gateway claim with respect to the substantive transportation money laundering charge, Stern must show that no reasonable juror would find beyond a reasonable doubt that he either did not (a) "arrange[] the transfer from Israel to the United States of the proceeds of bank fraud . . . , by arranging the transfer of the proceeds to a co-conspirator in Israel who in turn arranged for a co-conspirator in London to transfer a corresponding amount to Stern in New York," (b) know that the funds transferred represented the proceeds of bank fraud, or (c) know that such transfer was designed to "conceal or disguise the nature, the location, the source, the ownership, or the control" of the funds.  See Cuellar, 553 U.S. at 561.

It is unclear whether, in light of Santos, a reasonable juror would need to find that the funds at issue in Counts Three and Four constituted the "profits" of bank fraud, or merely "receipts" of the crime.  As noted earlier, only four Justices in Santos concluded that the term "proceeds" as used in Section 1956 means "profits" regardless of the nature of the underlying unlawful activity.  553 U.S. at 514.  "When a fragmented

Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds."  Marks v. United States, 430 U.S. 188, 193 (1977).  Santos therefore simply stands for the narrow proposition that "proceeds" means "profits" when the money allegedly laundered was derived from an illegal gambling business.  Santos, 553 U.S. at 526-528 (Stevens, J., concurring).  See United States v. Demarest, 570 F.3d 1232, 1242 (11th Cir. 2009) ("The narrow holding in Santos, at most, was that the gross receipts of an unlicensed gambling operation were not 'proceeds' under section 1956."); Gotti v. United States, No. 09 Civ. 2664 (FB), 2009 WL 197132, at *2 (E.D.N.Y. Jan. 28, 2009) ("Santos is limited to its facts; it stands only for the proposition that the money laundering statute does not make criminal the use of the revenue from an illegal gambling operation to pay for the expenses involved in running the operation").

       Courts are divided as to whether "proceeds" means "profits" when bank fraud is the predicate offense.  Compare United States v. Kratt, 579 F.3d 558, 563 (6th Cir. 2009) ("Santos thus does not require us to apply a profits definition of 'proceeds' to Kratt's offenses," which included bank fraud), with Abuhouran v. Grondolsky, 643 F. Supp. 2d 654, 661 (D.N.J. 2009), aff'd, 392 F. App'x 78 (3d Cir. 2010) ("The 'proceeds' of the predicate specified unlawful activity [in that case, bank fraud] means the profits of that activity and not its gross receipts.") (bracketed text added).  Assuming, without deciding, that "proceeds" means "profits" in the context of this case, a reasonable juror

could have concluded beyond a reasonable doubt that the cash transported to the United

States by Zaltzman (or, under the Government's version of the events, the money

"released" to Stern in New York), constituted the profits of bank fraud and that Stern was

aware of this fact.  There is no dispute that all of the money that was returned to, or

released in, the United States went to Ricky, the supplier of the stolen checks, at which

point "the check cashing scheme [was] complete."  (Hearing Tr. 10-11, 25, 58; see also

Ex. A at 4 ("The $40,000.00-50,000.00 in cash that came back from Israel all went to

Ricky.")).  Therefore, unlike the transactions at issue in Santos, which consisted of

payments to runners, lottery winners, and collectors involved in gambling operations, 553

U.S. at 510, it cannot be said that the alleged transactions giving rise to Counts Three and

Four constituted payment for "the essential expenses of operating" the stolen check

cashing scheme.  Id. at 528 (Stevens, J., concurring in the judgment).  Santos thus does

not provide a basis for finding Stern actually innocent with respect to the charges

described in Counts Three and Four of the Information.

    Cuellar, however, dictates a different result.  Under Cuellar, Stern has made

a "substantial showing" that it is more likely than not that no reasonable juror would

convict him of the charges alleged in Counts Three and Four because the purpose of

transporting (or transferring) either the proceeds of the stolen checks or the uncashed

checks from Israel to the United States was not – even in part – to disguise or conceal the

nature, location, source, ownership, or control of the money.  See Cuellar, 553 U.S. at

561-68.  Instead, the record establishes that the sole reason that the proceeds of the stolen

checks, as well as the remaining uncashed stolen checks, were returned to the United States was to pay Ricky, who had been hounding Stern for the money.  (See PSR ¶ 30 ("Stern explained that he needed the money because people were pressuring him."); Zimmerman Aff. at 14 (same); see also id. at 16 (uncashed stolen checks returned to the United States to "enable Stern to explain to the 'Italians' why he had not paid them"); Hearing Tr. 6, 10-11; see also id. at 32 ("The reason [wa]s to bring back the money.  You got checks you got to get paid for, that's all.")).

The Government maintains that Stern admitted knowing that the purpose of sending the proceeds of the cashed checks back to the United States was, at least in part, to conceal their source because he conceded during his guilty plea allocution that he knew that "part of the reason why" the money was returned by wire transfer, as alleged in Counts Three and Four, "was to hide where the money was coming from."[20]  (Gov't's July 2011 Mem. at 14; Plea Tr. 24-25).  Although a defendant's admissions of guilt generally "carry a strong presumption of verity . . . and are generally treated as conclusive in the face of the defendant's later attempt to contradict them," Adames v. United States, 171 F.3d 728, 732 (2d Cir. 1999) (internal quotations omitted), Stern's self-inculpatory words in this case are not enough to demonstrate that he is in fact guilty of transportation money laundering or conspiracy to commit that offense.

---

[20]    Stern made a similar admission under cross examination during the hearing, but quickly retreated.  (Compare Hearing Tr. 30 ("you got to understand that part of the reason why it was being done in both cases was to hide where the money was coming from"), with id. at 32 ("The reason is to bring back the money.  You got checks you got to get paid for, that's all.")).

At the outset, the government concedes that there never was a transfer between London and the United States in relation to the stolen check scheme alleged in Counts Three and Four.  (See Gov't's June 2011 Mem. at 16 ("the record establishes that Stern did not transfer the stolen check proceeds by bank wire"); Hearing Tr. 32 ("Q:  But that money wasn't brought back by wire, was it?  A:  No."); Jan. 7, 2011 Letter at 3 ("Notably, [Stern] did not transfer the stolen check proceeds by bank wire")).  If Stern's mistaken acknowledgment during his allocution that such a transfer took place is contrary to fact, then Stern's admission that the purpose of this phantom transfer was to disguise or conceal the source of the money is similarly entitled to no weight.

Additionally, the Government does not suggest how the mere act of transporting the proceeds of the stolen checks to the United States would in any way serve to disguise or conceal the money's nature, location, source, ownership, or control.[21] In fact, the stolen checks already had been cashed, making the concealment of their source and ownership a fait accompli.  It further is undisputed that the cash was being returned to Ricky, who was well aware of its nature, location, source, ownership, and control.  (Hearing Tr. 10-11).  In these circumstances, even though Stern admitted his guilt with respect to the concealment element of the transportation money laundering provision, a reasonable juror could have concluded that Stern was not guilty of the crime

---

[21]        Although it is conceivable that transporting the uncashed stolen checks from Israel to the United States could be part of a design to conceal (if, for example, the checks were being returned so that the conspirators could attempt to cash them in the United States), there is nothing to indicate that such a design existed in this case.

charged.  See Schlup, 513 U.S. at 330 (for purposes of the actual innocence gateway, "the mere existence of sufficient evidence to convict [is] not . . . determinative of [a] petitioner's claim").

The Government also contends that the "surreptitious manner" in which the proceeds of the stolen checks were paid to Ricky – i.e., by "having the money pass through several sources and individuals" in Israel and London "through the equivalent of a hawala money transfer system" – provides "strong evidence" that the purpose of moving the money to the United States was to hide its illegal source.  (See Gov't's June 2011 Mem. at 14-16; Jan. 7, 2011 Letter at 1-4; Oct. 15, 2010 Letter at 10).  The Government advanced a similar argument in Garcia, maintaining that the defendant's use of cash, rather than a check or wire, to pay for illegal drugs was evidence of an intent to disguise the nature, source, or ownership of the money.  See Garcia, 587 F.3d at 518.  The Second Circuit rejected that argument, however, observing that "the mere fact of transporting large amounts of cash rather than, as the government suggests, paying for drugs by check or wire, does not provide a basis to find a purpose to conceal."  Id. (emphasis in original).  If anything, using cash "proclaims, rather than conceals, the illicit matter of the transaction."  Id. (emphasis in original).

Here, too, the "manner" or "means" by which the proceeds of the stolen check cashing scheme allegedly made their way back to the United States, no matter how clandestine, plainly related to "how" the money was moved, not "why."  See Cuellar, 553 U.S. at 566 ("how one moves the money is distinct from why one moves the money.

32

Evidence of the former, standing alone, is not sufficient to prove the latter.") (emphasis in original).  Thus, even assuming that the cash proceeds of the first round of checks were returned to the United States in the manner described by the Government, rather than by Zaltzman on a plane, as Stern contends, this "black market system of cash payment," standing alone, does not establish the concealment element of transportation money laundering.

In sum, based on the facts, Stern has demonstrated that it is more likely than not that no reasonable juror would have found him guilty of a conspiracy to commit transportation money laundering or the substantive crime of transportation money laundering as charged in Counts Three and Four of the Information.[22]  Since Stern therefore has passed through the requisite gateway, the Court may review Stern's substantive claim of actual innocence insofar as it arises out of those charges.[23]

_____

[22]      This conclusion is based on the Government's charging decisions.  Had the United States Attorney simply charged that Stern transported the proceeds of bank fraud "from a place in the United States to or through a place outside the United States," i.e., exporting rather than importing them, there can be little doubt that Stern would be unable to prove his innocence.

The jury conceivably could also have been instructed that Stern would be guilty of transportation money laundering if he moved money from the United States to Israel, even though the Information charged him only with transporting from Israel to the United States.  Indeed, although Stern might have argued that this would constitute a constructive amendment, the Second Circuit has "consistently permitted significant flexibility in proof, provided the defendant was given notice of the core of criminality to be proven at trial."  See United States v. D'Amelio, 683 F.3d 412, 417 (2d Cir. 2012) (emphasis in original).  Thus, the change in the direction that the proceeds flowed might be viewed as a mere variance in proof, rather than a ground for reversal.

[23]      Since Stern has put forth a credible showing of actual innocence with respect to Counts Three and Four, there is no need to discuss his contention that transporting the proceeds

(continued...)

ii.     Stern's Actual Innocence With Respect to Counts Five
        and Six

Stern's gateway argument fares less well with respect to the transaction

money laundering charges arising out of the narcotics money laundering scheme alleged

in Counts Five and Six of the Information.  Santos cannot serve as a basis for establishing

Stern's innocence regarding those charges since the Second Circuit recently has held that

the term "'proceeds' under [Section] 1956 is not limited to 'profits' at least where, as

here, the predicate offense involves the sale of contraband."  United States v. Quinones,

635 F.3d 590, 600 (2d Cir. 2011) (emphasis added).  If so, Stern's admissions, both

during his plea and at the evidentiary hearing, that he knowingly picked up and delivered

"drug money," (see Plea. Tr. 23; Hearing Tr. 15), would lead a reasonable juror to

conclude that Stern conducted a "financial transaction" knowing that the "receipts" of

narcotics trafficking were involved.

Cuellar similarly is of little help to Stern with respect to Counts Five and

Six, since a reasonable juror would conclude that Stern did, in fact, conduct at least one

financial transaction involving the proceeds of narcotics trafficking knowing that the

purpose of that transaction was, at least in part, to disguise or conceal the nature, location,

source, ownership, or control of the money used in the transaction.  There is strong

evidence establishing that Stern knowingly received drug money and delivered it to

---

[23](...continued)
of the stolen checks from Israel to the United States constituted the final act of the crime of bank
fraud and, therefore, was not an "act[] of money laundering at all."  (See ECF No. 24 (letter from
John W. Mitchell, Esq., to the Court, dated Nov. 8, 2010, at 9-10)).

Bornstein, who also was involved in the stolen check cashing scheme.  Quite clearly, the acts of picking up and delivering the cash both would constitute "financial transactions" within the meaning of Section 1956(a)(1)(B)(i).  See Garcia, 587 F.3d at 515 (Section 1956(a)(1)(B)(i) "prohibits certain financial transactions — including the transfer or delivery of cash"); United States v. Gotti, 459 F.3d 296, 335-36 (2d Cir. 2006) (Section 1956 "indicates the mere receipt of funds does constitute the conducting of a transaction") (emphasis in original).  In addition, Stern admitted that he knew the money involved in his various pick-ups and deliveries represented the proceeds of narcotics trafficking.  (See, e.g., Hearing Tr. 15).

From this evidence, a reasonable juror would conclude that Stern knew that the purpose of delivering the money to Bornstein was, at least in part, to disguise or conceal its nature or source because (a) Stern admits that he served as the link between a "preexisting group in Israel that [wa]s laundering drug money, . . . and preexisting Colombian narcotics traffickers who ha[d] money that need[ed] to be laundered," (Supp. Decl. ¶ 11), and (b) Bornstein was involved in the stolen check cashing conspiracy with Stern.  In other words, if Stern was aware that the drug money he was delivering needed to be laundered, and he was delivering it to Bornstein, an individual whom he knew laundered money, a reasonable juror would conclude that Stern knew that the purpose of delivering the cash was to launder the money.

The evidence indicating that Stern used cash from one of his pick-ups to purchase and ship certain merchandise to Federico in order to "give [Federico] the cover

of a legitimate businessman" provides a second, independent basis for sustaining Stern's conviction with respect to Counts Five and Six.  (Ex. A at 6).  Indeed, a reasonable juror would conclude that at least one of the underlying purposes of that particular money pick-up was to obtain the funds that would be used to convert the drug money into merchandise so as to conceal the nature and source of the money, thereby giving Federico "the cover of a legitimate businessman."  (Id.).  That Stern was aware of this nefarious purpose is shown by the fact that he twice met with Federico in Panama to discuss "picking up money in New York, purchasing paint with the money, and sending paint to Federico."  (Ex. B at 2).  Although Stern insists that purchasing "odd lots" and shipping them to Panama was an unrelated and innocuous business venture, (see Stern Decl. ¶¶ 7-10), he cannot show that no juror could reasonably credit the Government's version of the events.  It follows that Stern cannot demonstrate his actual innocence as a gateway matter with respect to the transaction money laundering charges set forth in Counts Five and Six of the Information.

* * *

In sum, Stern has put forth a credible claim of actual innocence with respect to Counts Three and Four of the Information, thereby enabling this Court to consider his claims relating to those counts despite the expiration of the AEDPA statute of limitations.[24]  As set forth below, however, despite this procedural triumph, Stern's claims regarding

---

[24]    Stern also faces the additional procedural hurdle that these claims are procedurally defaulted because he could have raised them on direct appeal.  See Bousley v.

(continued...)

the transportation money laundering scheme charged in those counts are ultimately

unavailing.

        2.    <u>Merits</u>

Stern's three substantive claims for relief are that:  (a) there was no factual

basis for his plea, in violation of Rule 11(b)(3) of the Federal Rules of Criminal

Procedure; (b) his plea did not comport with due process because it was not voluntary and

knowing; and (c) because he is innocent, his continued imprisonment is unlawful under

the Due Process Clause and the Eighth Amendment to the United States Constitution.

        a.    <u>Factual Basis for Plea</u>

Rule 11(b)(3) of the Federal Rules of Criminal Procedure provides that,

"[b]efore entering judgment on a guilty plea, the court must determine that there is a

factual basis for the plea."  "The purpose of this requirement is to protect a defendant who

is in the position of pleading voluntarily with an understanding of the nature of the charge

but without realizing that his conduct does not actually fall within the charge."  <u>United

States v. Cruz-Rojas</u>, 101 F.3d 283, 285 (2d Cir. 1996) (internal quotations omitted).

Rule 11(b)(3) does not "require the court to weigh evidence to assess

whether it is even more likely than not that the defendant is guilty.  Rather, Rule

11[(b)(3)] simply requires the court to assure itself that the conduct to which the

defendant admits is in fact an offense under the statutory provision under which he is

---

[24](...continued)
<u>United States</u>, 523 U.S. at 621-23.  Stern's actual innocence under the <u>Schlup</u> standard provides
a basis, however, for also excusing this default.  <u>Id.</u>

pleading guilty." United States v. Maher, 108 F.3d 1513, 1524 (2d Cir. 1997).  In

assessing whether there was a sufficient factual basis for the plea, a court is limited to

facts on the record at the time of the plea proceeding.  United States v. Adams, 448 F.3d

492, 499 (2d Cir. 2006) ("Such facts must already exist on the record or be put on the

record at the time of the giving of the plea after an inquiry of the defendant, the

government, or other available sources of information.") (internal quotations and

emphasis omitted).

       Stern has shown, based on all of the evidence presently before the Court,

that it is more likely than not that no reasonable juror would find him guilty of

transportation money laundering or conspiracy to do so as charged in Counts Three and

Four of the Information.  That victory, however, is Pyrrhic since he cannot demonstrate

that there was no factual basis underlying his plea to those charges.  Although Stern's

guilty plea allocution is concededly not a model of clarity, he did admit that:  (a) "there

were other people who [we]re involved" in the scheme to have the stolen checks

"[c]ashed over there [in Israel] and [have the cash] brought back . . . over here [the United

States];" and (b) he knew that the checks were stolen.  (Plea Tr. 22).  Judge Lynch

obviously was unaware that the stolen check scheme, unlike the narcotics laundering

scheme, did not involve the use of any wire transfers.  Accordingly, in an effort to clarify

the facts, Judge Lynch asked Stern whether concealing the money was "part of the

reason" wire transferring had been "done in both cases."  (Id. at 25).  This was in

response to the prosecutor's request that Judge Lynch establish the purpose of the wire

transfers in "both the drug money and the bank fraud, Counts 4 and 6 of the indictment [sic] in each case." (Id. at 24). In his seven-word response, "Yeah, to hide – correct, yes Your Honor," Stern admitted that both schemes had involved the use of wire transfers to move money internationally and that the purpose of those transfers was to hide the source of the money. Stern therefore established through his own statement the concealment element necessary to prove his guilt on the charges of transportation money laundering and conspiracy to commit that crime.

        Unfortunately for Stern, the outcome of his present challenge to his conviction does not hinge on the fact that he "did not transfer the stolen check proceeds by bank wire." (See Gov't's July 2011 Mem. at 16). All that matters for purposes of satisfying Rule 11(b)(3) is that "the conduct to which the defendant admits is in fact an offense under the statutory provision under which he is pleading guilty." Maher, 108 F.3d at 1524. Thus, Stern's admission that he caused the transfer of the proceeds of the stolen checks from Israel to the United States via wire, knowing that "part of the reason why this was being done . . . was to hide where the money was coming from," (Plea Tr. at 25), even if untrue, is enough to defeat his Rule 11(b)(3) claim.

b.    Due Process

Stern also attacks his plea on the basis that it was not "informed and/or knowing." (Pet. ¶ 9). "[A] plea may be collaterally attacked if it was not knowing or not voluntary, and a plea cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts." Salas v. United States, 139 F.3d 322, 324 (2d Cir. 1998) (internal quotation marks and citations omitted). In Salas, the movant sought "to vacate his plea of guilty to a charge of using and carrying a gun, in violation of 18 U.S.C. § 924(c), in light of the Supreme Court's decision in Bailey v. United States," which "held that a conviction under the 'use' prong of section 924(c) 'requires evidence sufficient to show an active employment of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense.'" Id. at 323 (quoting Bailey, 516 U.S. 137, 143 (1995)). Like Stern, Salas contended that the facts to which he allocuted were insufficient as a matter of law to establish the elements of the crime to which he pleaded guilty.

Although a federal prisoner may "invoke an intervening change in law to challenge collaterally whether th[e] facts [admitted at his plea] would constitute a crime," the Second Circuit has made clear that the prisoner may not "challenge the facts underlying his guilty plea." Id. at 325; see also United States v. Simmons, 164 F.3d 76, 79 (2d Cir. 1998) ("we made it clear in Salas that the facts admitted in the course of that guilty plea were not open to challenge . . . Defendant in the instant case . . . [therefore] is not entitled to expungement from the record of factual admissions underlying that guilty

40

plea").  As noted above, the facts admitted by Stern at his plea proceeding establish the elements of transportation money laundering and conspiracy to commit that offense. Therefore, under Salas, Stern may not now challenge those facts in this proceeding, even though he has shown to a considerable degree of certainty that the conduct to which he admitted did not, in fact, occur.  It follows that Stern's claim that his plea was not knowing or voluntary must be denied.

c.     <u>Freestanding Innocence Claim</u>

Stern's final substantive claim is that, because he is innocent of at least some of the charges to which he pleaded guilty, his continued imprisonment on those charges violates the Due Process Clause and the Eighth Amendment's prohibition on cruel and unusual punishment.  (See Pet'r's June 2010 Mem. at 5).

The Supreme Court has never held that a "freestanding" claim of actual innocence, – i.e., a claim seeking to vacate a constitutionally-sound conviction on the ground that the petitioner is innocent – affords a basis for collateral relief.  See Dist. Att'y's Office for the Third Judicial Dist. v. Osborne, 557 U.S. 52, 71 (2009) (describing the existence of a federal constitutional right to be released upon proof of actual innocence as "an open question"); see also Herrera, 506 U.S. at 417 (assuming, arguendo, that a "truly persuasive" post-trial demonstration of actual innocence in a capital case would render defendant's execution unconstitutional).  Even if such a claim were cognizable in this non-capital proceeding under Section 2255, however, Stern's freestanding innocence claim would have to be denied for the same reason as his due

41

process claim:  "By his plea, [Stern] waived a challenge to the facts themselves."  Salas, 139 F.3d at 324 (quoting Lee v. United States, 113 F.3d 73, 75 (7th Cir. 1997)); see also Seiller v. United States, 544 F.2d 554, 567 (2d Cir. 1975) ("Seiller's argument that his protestations of innocence, coupled with his present version of the facts, necessitate a hearing ignores the limited purpose of the § 2255 proceeding which he initiated . . . If a court were required in a § 2255 proceeding to explore a defendant's new version of the facts, the proceeding would amount to little less than the trial which the defendant waived by pleading guilty.").  Since Stern cannot now contest the facts to which he pleaded guilty, he is unable to establish a freestanding innocence claim.

Thus, none of Stern's substantive claims warrant vacating, correcting, or setting aside his conviction under Section 2255.  The only remaining issue is whether any other alternative avenues for relief dictate a different result.

B.    Other Potential Remedies

1.    Section 2241

Section 2241 gives federal courts the power to issue writs of habeas corpus to prisoners "in custody in violation of the Constitution or laws or treaties of the United States.'"  28 U.S.C. § 2241(a), (c)(3).  Despite this broad language, challenges to the legality of a prisoner's sentence generally must proceed in the form of a motion under Section 2255, while challenges to the execution of the sentence, i.e., matters relating to "the administration of parole, computation of a prisoner's sentence by prison officials, prison disciplinary actions, prison transfers, type of detention and prison conditions," are

42

properly addressed in a petition for a writ of habeas corpus pursuant to Section 2241.

Jiminian, 245 F.3d at 146-47.

       "In some very limited circumstances, claims that fall within the substantive

scope of § 2255 may properly be made in a petition filed under § 2241." Poindexter v.

Nash, 333 F.3d 372, 378 (2d Cir. 2003).  In order to fall within those "very limited

circumstances," a habeas petitioner "not only must show that relief is procedurally

unavailable under § 2255, but also must assert a claim of actual innocence that (a) is

'provable . . . on the existing record,' and (b) 'could not have effectively been raised . . .

at an earlier time."  Id. (quoting Triestman, 124 F.3d at 363).

       Section 2241 is of no help to Stern for at least three reasons.  First, Stern

cannot show that "relief is procedurally unavailable" under Section 2255 insofar as his

claims arise out of his conviction on the transportation money laundering-related charges

because, as set forth above, Stern's actual innocence enables him to bypass the statute of

limitations and present the merits of these claims to the Court.  See Section II.A.1-2,

supra.  Second, even if the statute of limitations barred the Court from hearing Stern's

claims relating to the transportation money laundering charges, Stern is unable to show

that his innocence claim could not have effectively been raised at an earlier time.  See

Middleton v. Schult, 299 F. App'x 94, 96 (2d Cir. 2008) ("A lack of case law to support a

claim . . . does not render that claim unavailable" under Section 2241).  Any claims

pertaining to the transaction money laundering-related charges fail for that same reason.

Third, as noted earlier, Stern has not presented a claim of actual innocence that is

provable on the existing record.  It follows that Stern's only remaining potential vehicles for relief are the extraordinary writs of <u>audita querela</u> and error <u>coram nobis</u>, to which I now turn.

    2.    <u>Extraordinary Writs</u>

The writ of <u>audita querela</u> is available only "if the absence of any avenue of collateral attack would raise serious constitutional questions about the laws limiting those avenues."  <u>Richter</u>, 510 F.3d at 104.  The Second Circuit has held "that if the claim petitioner seeks to raise was previously available to him, the 'failure to permit review of that claim would not raise serious constitutional questions.'"  <u>Middleton</u>, 299 F. App'x at 95-96 (quoting <u>Jiminian</u>, 245 F.3d at 147).  Thus, even if all other avenues of collateral relief were foreclosed to Stern, because he could have raised his actual innocence claim at an earlier time, <u>see id.</u> at 96, he is not entitled to a writ of <u>audita querela</u>.

To make use of the writ of error <u>coram nobis</u>, a petitioner must no longer be serving his sentence.  <u>See</u> <u>Fleming v. United States</u>, 146 F.3d 88, 89-90 (2d Cir. 1998) ("<u>Coram nobis</u> is essentially a remedy of last resort for petitioners who are no longer in custody pursuant to a criminal conviction and therefore cannot pursue direct review or collateral relief by means of a writ of habeas corpus.").  Here, Stern is still serving his sentence; accordingly, he is ineligible to obtain a writ of error <u>coram nobis</u>.

\*   \*   \*

In sum, despite the fact that Stern has shown that it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt of the charges

alleged in Counts Three and Four of the Information, his conviction is not subject to collateral attack and must be sustained.[25]

III.   Conclusion

        For the reasons set forth above, Stern's Petition, (ECF No. 1), should be denied.

_____

[25]     Because Stern is not entitled to relief with respect to any of the money laundering-related charges, his sentences on Counts One and Two of the Information also must remain undisturbed.  (See Pet'r's July 2009 Mem. at 5 (urging vacatur of the sentences imposed on Counts One and Two "insofar as [they] . . . were derived from the alleged money laundering conduct.")).

IV.    Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Paul A . Crotty and to the chambers of the undersigned at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Crotty. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

Dated:    New York, New York
          January 4, 2013


                                    _____
                                    FRANK MAAS
                                    United States Magistrate Judge




Copies to Counsel via ECF